[Nos. 24612-1-II; 24894-8-II. Division Two. October 27, 2000.]

LACEY NURSING CENTER, INC., *Appellant,* v. THE DEPARTMENT OF REVENUE, *Respondent.*
OLYMPIC HEALTH SERVICES, INC., ET AL., *Appellants* v. THE DEPARTMENT OF REVENUE, *Respondent.*

170

*George E. Kargianis* (of *Kargianis Watkins Werner, L.L.P., P.S.*); *Charles C. Stockmeyer*; and *Raymond G. Dodge*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Cameron G. Comfort, Assistant*, for respondent.

ARMSTRONG, C.J. — Lacey Nursing Center, Inc., Olympic Health Services, Inc., and Sherwood Manor, Inc. (Taxpayers) are for-profit nursing homes that seek refunds of business and occupation (B&O) taxes for the period 1989 through 1992. Taxpayers claim an exemption from B&O taxes for that portion of their revenue derived from the "lease" of rooms to residents. This claim is based on the sale-of-real-estate exemption under RCW 82.04.390 and WAC 458-20-118 (Rule 118) that includes proceeds derived from renting or leasing property. Taxpayers argue that they are entitled to a presumption that they lease rather than license real property because most of their residents occupy their rooms for a continuous period of more than one month. The Department of Revenue argues that the sale-of-real-estate exemption does not apply to leased or rented property and, in the alternative, that nursing homes are not eligible for the exemption. In addition, the Department argues that Taxpayers merely grant licenses to residents to occupy their rooms. The trial court granted summary judgment for the Department, and Taxpayers appeal. We affirm, holding that Taxpayers do not lease rooms to their residents.

## FACTS

### Taxpayers' Operations

Taxpayers are for-profit nursing homes licensed by the State of Washington. According to the Washington Health Care Association, which represents nursing homes, they are a business "dedicated to caring for people during the most physically frail moments in their life. The specialized care and many services found in a nursing home are not found in any other setting." Nursing homes provide personal ser-

vices and medical care 24 hours a day, 7 days a week for their residents.

The majority of Taxpayers' residents fund their stay through the Medicaid or Medicare programs. Nursing homes eligible for Medicaid and Medicare are subject to a series of federal and state laws and regulations that govern the rights and treatment of residents. *See generally* 42 U.S.C. §§ 1395i-3, 1396r; 42 C.F.R. § 483.1; chapters 18.51, 74.42 RCW, and chapter 388-97 WAC.

For example, residents can be admitted to a nursing home only by a doctor's orders, and they can stay only as long as both they and the doctor believe it is necessary for them to receive special personal and medical services that the doctor has ordered. *See* WAC 388-97-085(3)(b). The resident's physician must document the clinical bases for any change in the resident's condition justifying discharge. 42 U.S.C. §§ 1396r (c)(2)(A), 1395i-3(c)(2)(A); 42 C.F.R. § 483.12(a)(3). *See also* RCW 74.42.450. Once admitted, most residents remain in the nursing home for the rest of their lives.

During their occupancy, residents may control the temperature, lighting, and windows in their rooms. They have the right to use personal belongings and their own bed and furnishings. 42 C.F.R. § 483.15(h); WAC 388-97-070(15). They may lock their room doors from the inside. They may have a refrigerator in the room, a direct telephone line, and within space limits, may furnish and decorate their rooms. Residents are free to come and go from the facility, and they may have visitors at any time during the day or night. They wear their own clothes.

Nursing home residents also may admit or exclude anyone from the room, including nursing home staff. Except for emergencies or for routine housekeeping, staff members knock, identify themselves, and ask permission to enter. Residents may refuse medical treatment. 42 C.F.R. §§ 483.10(b)(4), 483.10(d)(l)-(3); WAC 388-97-070(4)(d).

## ANALYSIS

While acknowledging that Taxpayers' residents enjoy "some of the indicia of tenancy," the trial court concluded that their residency is incidental to the care provided and is only a license to use and occupy a portion of Taxpayers' premises in order to receive health care services. In analyzing this conclusion, we address several interrelated questions.

A. Does the-sale-of-real-estate exemption from Washington's business and occupation tax apply to the proceeds derived from renting or leasing real property?

The Department contends that the sale-of-real-estate exemption does not apply to the rental or lease of real estate. We disagree.

Washington's business and occupation tax is imposed on every person for the act or privilege of engaging in business activities in this state. RCW 82.04.220. The statutes governing the B&O tax define numerous terms. And, unless the context clearly requires otherwise, the definitions apply throughout the chapter. RCW 82.04.010. The general directive is followed by specific categories of taxation and specific exemptions and deductions. *See* RCW 82.04.2201-2907; *see also* RCW 82.04.310-427.

RCW 82.04.390 exempts the "gross proceeds derived from the sale of real estate" from the tax. In RCW 82.04.040, "sale" is defined in part as

> any transfer of the ownership of, title to, or possession of property for a valuable consideration and includes any activity classified as a "sale at retail" or "retail sale" under RCW 82.04.050. *It includes renting or leasing*, conditional sale contracts, leases with option to purchase, and any contract under which possession of the property is given to the purchaser but title is retained by the vendor as security for the payment of the purchase price.

(Emphasis added.)

The Department argues that the legislative history of

these statutes shows that the Legislature did not intend to exempt the gross proceeds of rented or leased real property from taxation. But we need not consider the Department's analysis of legislative history because the language of RCW 82.04.390 and RCW 82.04.040 is not ambiguous.

 Our goal in construing a statute is to give effect to legislative intent. *Sacred Heart Med. Ctr. v. Dep't of Revenue*, 88 Wn. App. 632, 636, 946 P.2d 409 (1997); *Palmer v. Dep't of Revenue*, 82 Wn. App. 367, 372, 917 P.2d 1120 (1996). To determine legislative intent, we review the disputed statutory language within the context of the statute as a whole. *Sacred Heart*, 88 Wn. App. at 636 (citing *In re Sehome Park Care Ctr., Inc.*, 127 Wn.2d 774, 778, 903 P.2d 443 (1995)). Absent ambiguity or a statutory definition, the words in a statute are given their common and ordinary meaning. *Garrison v. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976); *Palmer*, 82 Wn. App. at 372. We may look to the dictionary to ascertain the common meaning of undefined terms. *Garrison*, 87 Wn.2d at 196. We should avoid "[s]trained, unlikely or unrealistic" interpretations. *Bour v. Johnson*, 122 Wn.2d 829, 835, 864 P.2d 380 (1993).

 A statute is ambiguous if it is susceptible to two or more reasonable interpretations. *Sacred Heart*, 88 Wn. App. at 636 (citing *Schelinski v. Midwest Mut. Ins. Co.*, 71 Wn. App. 783, 787, 863 P.2d 564 (1993)). If a statute is ambiguous, we look to other sources of legislative intent, such as legislative history. *See Sehome*, 127 Wn.2d at 778. In addition, we "accord great weight to the contemporaneous construction placed upon [the statute] by officials charged with its enforcement, especially where the Legislature has silently acquiesced in that construction over a long period." *Sehome*, 127 Wn.2d at 780.

 Here, the phrase "sale of real estate" is not ambiguous. The exemption for the "sale of real estate" in RCW 82.04.390 must be interpreted based on the definition of "sale" in RCW 82.04.040, "[u]nless the context clearly requires otherwise." RCW 82.04.010. The Department again argues that the term "context" requires us to review

the legislative history of RCW 82.04.390. We decline to do so for the following reasons.

First, such a construction would require courts to look to legislative history to determine whether there is an alternative meaning for any of the statutorily defined terms in chapter 82.04 RCW. Second, the common meaning of the term "context" belies the Department's assertion. *Webster's Third New International Dictionary* 492 (1969) defines "context" in part as "the part or parts of a written or spoken passage preceding or following a particular word or group of words and so intimately associated with them as to throw light upon their meaning." Similarly, *Black's Law Dictionary* 320 (6th ed. 1990) provides: "The context of a particular sentence or clause in a statute, contract, will, etc., comprises those parts of the text which immediately precede and follow it."

■ In its entirety, RCW 82.04.390 provides as follows:

This chapter shall not apply to gross proceeds derived from the sale of real estate. This however, shall not be construed to allow a deduction of amounts received as commissions from the sale of real estate, nor as fees, handling charges, discounts, interest or similar financial charges resulting from, or relating to, real estate transactions.

Nothing in the language preceding or following the words "sale of real estate" requires a definition other than that provided in RCW 82.04.040.

And RCW 82.04.040 defines sale as "any transfer of the ownership of, title to, or possession of *property* for a valuable consideration and includes any activity classified as a 'sale at retail' or 'retail sale' under RCW 82.04.050." (Emphasis added.) In addition, sale "includes renting or leasing." RCW 82.04.040.

Relying on *Gandy v. State*, 57 Wn.2d 690, 359 P.2d 302 (1961), the Department argues that the terms "renting or leasing" refer only to the renting or leasing of personal property subject to the retail sales tax act under RCW

82.08.010(4).[1] In *Gandy*, the Supreme Court stated that "[t]he 1959 legislature amended RCW 82.04.040 to include within the definition of 'sale' as used in that chapter, the renting or leasing of tangible personal property, and thereby made the privileges of renting and leasing of such property subject to the sales tax." *Gandy*, 57 Wn.2d at 692. But the issue in *Gandy* was whether sales tax was properly collected from lessees of automobiles and trucks. *Gandy*, 57 Wn.2d at 694. The court did not consider whether the Legislature intended to distinguish between real and personal property in the definition of sale. *See Gandy*, 57 Wn.2d at 692-94.

 Read in context, the language of RCW 82.04.040 supports a broader definition of "property" than the Department suggests. First, the statute refers to "any transfer of the ownership of, title to, or possession of property . . . *and* includes any activity classified as a 'sale at retail' or 'retail sale' under RCW 82.04.050." Under RCW 82.04.050(1), the terms "sale at retail" and "retail sale" mean "every sale of tangible personal property . . . to all persons irrespective of the nature of their business" subject to limited exceptions. And the terms also include "the renting or leasing of tangible personal property to consumers." RCW 82.04-.050(4). Thus, the Legislature used both the concepts of property and tangible personal property in the statute. This strongly suggests that when it used the word "property" it must have intended something other than tangible personal property.

The term "property" is "commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate." BLACK's LAW DICTIONARY at 1216. Under the Revenue and Taxation Article of the state constitution, the word "property" includes "everything, whether tangible or intangible, subject to

---

[1] The definition of "sale" under the sales tax scheme incorporates the definition of "sale" under the B&O tax scheme. *See* RCW 82.08.010(4).

ownership." CONST. art. VII, § 1. We conclude, without resort to legislative history, that the plain meaning of the word "property" encompasses real property.

This interpretation is consistent with *Apartment Operators Ass'n of Seattle v. Schumacher*, 56 Wn.2d 46, 351 P.2d 124 (1960). There, the court struck down the 1959 act in which the Legislature applied the B&O tax to the renting or leasing of real property. *Schumacher*, 56 Wn.2d at 47-48. Taxing rental income was held to violate the uniformity clause of article VII, section 1 (amend. 14) of the state constitution. *Schumacher*, 56 Wn.2d at 47. The court observed that "a tax on rental income is a tax on property, and not an excise tax. Furthermore, a tax upon rents from real estate is a tax upon the real estate itself, and is, thus, a second tax upon real estate." *Schumacher*, 56 Wn.2d at 47. Although the decision in *Schumacher* has been questioned in later decisions,[2] a 6 - 3 majority of the Supreme Court recently relied on *Schumacher* to strike down a fee charged for dwelling units rented or leased or offered for rent or lease. *Harbour Vill. Apartments v. City of Mukilteo*, 139 Wn.2d 604, 608, 989 P.2d 542 (1999).[3]

Finally, the plain-language analysis is also consistent with the Department's own interpretation of the sale-of-real-estate exemption following the decision in *Schumacher*. After the Legislature removed references to renting or leasing from the real estate exemption in 1959, the Department amended WAC 458-20-118 (Rule 118) to reflect that change. *Compare* Rule 118 (eff. Nov. 1, 1951) ("Amounts derived from the lease, rental or sale of real estate are exempt from taxation . . . .") *with* Rule 118 (eff. Apr. 1, 1959) ("Amounts derived from the sale of real estate are exempt . . . ."). But following the *Schumacher* decision, the Department again amended its rule to provide: "Amounts

---

[2] *See Black v. State*, 67 Wn.2d 97, 100, 406 P.2d 761 (1965); *Shurgard Mini-Storage v. Dep't of Revenue*, 40 Wn. App. 721, 723 n.2, 700 P.2d 1176 (1985).

[3] In *Harbour Village*, the Department filed an amicus brief asking the court to overrule *Schumacher*, but the Court declined to do so. *Harbour Vill.*, 139 Wn.2d at 615 n.7 (Talmadge J., dissenting).

derived from the sale and *rental* of real estate are exempt . . . ." Rule 118 (eff. April 14, 1960) (emphasis added). This language remains today. *See* Rule 118 (2000).

The Department contends that this does not reflect legislative intent because the Department's amendment was in response to *Schumacher*. But *Schumacher* is still good law, and an agency's contemporaneous interpretation of a statute is given great weight. *Sehome*, 127 Wn.2d at 780.

■ Thus, we conclude that the sale-of-real-estate exemption applies to the rental or lease of real estate. The question thus becomes whether Taxpayers engage in such rental or lease.

B. Are nursing homes entitled to the statutory presumption that the occupancy of real estate for one month or more constitutes a rental or lease of real estate?

Taxpayers argue that they are entitled to the presumption in RCW 82.04.050(2)(f) that "the occupancy of real property for a continuous period of one month or more constitutes a rental or lease of real property."

This presumption is part of the statute's definition of the term "sale at retail" or "retail sale," which includes:

> The sale of and charge made for the furnishing of lodging and all other services by a hotel, rooming house, tourist court, motel, trailer camp, and the granting of any similar license to use real property, as distinguished from the renting or leasing of real property, and it shall be presumed that the occupancy of real property for a continuous period of one month or more constitutes a rental or lease of real property and not a mere license to use or enjoy the same; . . . .

RCW 82.04.050(2)(f).

■ The statute thus creates a presumption of a lease or rental based on 30-day occupancy in a hotel, rooming house, tourist court, motel trailer camp, *"and the granting of any similar license to use real property."* RCW 82.04.050(2)(f) (emphasis added). What the Legislature means by "the

granting of any similar license" could potentially include nursing homes and is, therefore, ambiguous.

But in 1951, when section (2)(f) was enacted,[4] the Department interpreted this section to apply to "all establishments which are held out to the public as an inn, hotel, public lodging house, or place where sleeping accommodations may be obtained" and explained that it does not include "hospitals, sanitariums, nursing homes, rest homes, and similar institutions." Rule 166 (revised eff. Nov. 1, 1951). At the same time, Rule 118, which explains the sale-of-real-estate exemption, provided: "It is presumed that the rental of lodging and related services by a hotel, motel, tourist court, etc., for a continuous period of thirty days or more is a rental of real estate." WAC 458-20-118 (Revised eff. Nov. 1, 1951). The Department was obviously referring to the presumption of RCW 82.04.050 and Rule 166.

Although Rule 166 has been amended numerous times,[5] it still describes "the taxation of persons operating establishments such as hotels, motels, and bed and breakfast facilities, which provide lodging and related services to transients for a charge."[6] WAC 458-20-166(1). And the Department has continued to exclude hospitals, sanitariums, nursing homes, rest homes, and similar institutions. WAC 458-20-166(1)(b)(i).

Because we accord great weight to the interpretation of a statute by the agency charged with its enforcement, we defer to the Department's interpretation of RCW 82.04.050, which excludes nursing homes from the presumption. *See Sehome*, 127 Wn.2d at 780.

---

[4] LAWS OF 1951, 2d ex. Sess., ch. 28, § 3.

[5] In addition to explaining the retail sales tax and the B&O tax, the current version of Rule 166 explains the special hotel/motel tax, the convention and trade center tax, and the taxation of emergency housing furnished to the homeless. Thus, Rule 166 looks very different in form from the earlier version.

[6] Transient "means any guest, resident, or other occupant to whom lodging and other services are furnished under a license to use real property for less than one month." WAC 458-20-166(2).

C. Are Taxpayers eligible for the rental-of-real-estate exemption because they are engaged in more than one business activity and can segregate their income?

Taxpayers argue that they are entitled to the exemption because they can segregate the lodging component of their total revenues from the nursing services component pursuant to WAC 458-20-118(3)(a), which requires taxpayers to segregate their income when they are involved in more than one business activity. *See also* RCW 82.04.440 (addressing the taxation of multiple business activities). The Department responds that the statute and the possibility of segregating income applies to taxpayers engaged in multiple business activities and not to taxpayers engaged in a single business activity with more than one integral component.

Furthermore, Rule 118 explains that "[a]mounts derived from the granting of a license to use real property are taxable under the service B&O tax classification unless otherwise taxed under another classification by specific statute, e.g., sale of lodging taxed under retailing. (See RCW 82.04.050 and 82.04.290.)" WAC 458-20-118(1). Thus, if Taxpayers merely grant residents a license to use their facilities, their lodging revenue must be taxed under the same classification as their nursing services revenue.

The idea that a care facility may rent rather than license its rooms, and thereby segregate lodging revenue from services revenue, comes from two Department determinations issued in 1990 that involved congregate-care facilities. In both, the Department concluded that the congregate-care facilities were similar to sanitariums, nursing homes, or rest homes under Rule 168 and were, therefore, subject to B&O taxation under the "Service and Other" classification. The Department held further, however, that a congregate-care facility was entitled to an exemption for the rental of real estate under Rule 118 if it could segregate with reasonable accuracy the amounts received from the rental of real estate from amounts derived from personal and professional services under Rule 168.

The first determination involved a congregate-care mental-health facility for mentally ill adults that was licensed as a boarding home. The facility did not furnish acute medical treatment to its residents, but it hired a mental health coordinator to implement the residential portion of treatment plans provided by outside treatment agencies. In finding the facility eligible for the rental-of-real-estate exemption, the Department described the residents' living conditions as follows:

> Here, individual rooms are provided to clients. Each occupant has the exclusive right to continuous possession of the room against the world. Although a client may be required to share a room in certain cases, the room sharing arrangement is completely consensual between the occupants. The fact that the facility staff has the right to enter the room to do housekeeping or to handle an emergency is comparable to the right of entry retained by hotel management.

The second determination involved a congregate-care facility for developmentally disabled adults that was also licensed as a boarding home. The facility provided personnel to cook meals, supervise medication, and assist residents with housekeeping. A staff member was present 24 hours a day to respond to problems and supervise the residents, but the facility employed no medically trained staff. The residents had a "great degree of latitude in selecting potential roommates" and roommate selection was completely consensual. Residents had their own room keys. Although the staff also had keys, they could use them to enter residents' rooms only in an emergency. Each resident was given a resident rights form that allowed them to exclude others from their rooms, decorate and furnish their rooms, and gave them notice before a room transfer. From these facts, the Department reasoned that the lodging furnished to residents did not constitute a mere granting of a license to use real estate.

Relying on these decisions, Taxpayers argue that their residents rent or lease their rooms and are not simply licensees.

### D. Do nursing home residents have a "lease" or a "license"?

Taxpayers argue that the trial court erred in using a test derived from Rule 118 to conclude that their residents are licensees rather than lessees. Instead, Taxpayers argue that the court should have applied the common law definition of "lease." We conclude as a matter of law that the Legislature did not intend to consider nursing homes as lessors of property.

Under Rule 118, the lease or rental of real estate and a license to use real estate are distinguished as follows:

> (2) **Lease or rental of real estate.** A lease or rental of real property conveys an estate or interest in a certain designated area of real property with an exclusive right in the lessee of continuous possession against the world, including the owner, and grants to the lessee the absolute right of control and occupancy during the term of the lease or rental agreement. An agreement will not be construed as a lease of real estate unless a relationship of "landlord and tenant" is created thereby. It is presumed that the sale of lodging by a hotel, motel, tourist court, etc., for a continuous period of thirty days or more is a rental of real estate. It is further presumed that all rentals of mini-storage facilities, apartments and leased departments constitute rentals of real estate. The rental of a boat moorage slip or an airplane hangar/tie down site is presumed to be a rental of real estate only if a specific space, slip, or site is assigned and the rental is for a period of thirty days or longer.

> (3) **License to use real estate.** A license grants merely a right to use the real property of another but does not confer exclusive control or dominion over the same. Usually, where the grant conveys only a license to use, the owner controls such things as lighting, heating, cleaning, repairing, and opening and closing the premises.

█ The common law distinction is similar. "A tenant's primary right is to have exclusive possession and use" of real property. WILLIAM B. STOEBUCK, 17 WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 6.18, at 319 (1995); *see also* § 6.3 (1995). Possession "implies exclusive control of the area possessed." STOEBUCK, *supra*, § 6.3, at 295. A license

merely grants the use of another's land. STOEBUCK, *supra*, § 6.3, at 295.

Stoebuck's distinction between a "lodger" and "tenant" clarifies the Department's treatment of the congregate-care facilities and the trial court's decision that nursing homes primarily provide medical services with only a license to use a room:

> No Washington decision defining "lodger" has been discovered, but other courts have found the following factors persuasive that persons are lodgers and not tenants: they shared food service, they shared bathroom facilities, the operator of the building had free access to their rooms, the operator provided maid service and linens, and the room was furnished. If the person uses the room only temporarily or for a short time, this also tends to show a lodger relationship, though it is true that many persons who are lodgers in rooming and boarding houses remain there for long periods of time. In the litigated cases, the main consequence of lodger status is that the owner of the premises has a higher duty of care for a lodger's or guest's personal safety than a landlord has for a tenant's safety.

STOEBUCK, *supra*, § 6.3, at 296-97.

Although nursing homes bear some similarity to congregate-care facilities, Washington law regards them as different types of care institutions. Nursing homes are defined as

> any home, place or institution which operates or maintains facilities providing convalescent or chronic care, or both, for a period in excess of twenty-four consecutive hours for three or more patients not related by blood or marriage to the operator, who by reason of illness or infirmity, are unable properly to care for themselves. Convalescent and chronic care may include but not be limited to any or all procedures commonly employed in waiting on the sick, such as administration of medicines, preparation of special diets, giving of bedside nursing care, application of dressings and bandages, and carrying out of treatment prescribed by a duly licensed practitioner of the healing arts. It may also include care of mentally incompetent persons.

RCW 18.51.010(1). This statute adds that:

> Nothing in this definition shall be construed to include any

boarding home, guest home, hotel or related institution which is held forth to the public as providing, and which is operated to give only board, room and laundry to persons not in need of medical or nursing treatment or supervision except in the case of temporary acute illness.

RCW 18.51.010(1). It is also significant that the Legislature has excluded nursing homes from the provisions of the Residential Landlord Tenant Act (RLTA) because residence at the institution is "merely incidental to detention or the provision of medical . . . services." RCW 59.18.040(1).

 Based on the same exclusion, Division One has held that congregate-care facilities are also excluded from the RLTA because the residents cannot live independently and require personal care, supervision, and assistance with daily living activities. *Sunrise Group Homes, Inc. v. Ferguson*, 55 Wn. App. 285, 288, 777 P.2d 553 (1989). The court observed that although a client at the Olivia Park facility has less supervision and assistance with daily living than does a client in a nursing home, an Olivia Park client has a more structured environment and has more services provided than does the tenant in a traditional rental situation.

> Congregate care facilities, while not among the named living arrangements explicitly excluded from the RLTA such as licensed nursing homes, convents, and hospitals, RCW 59.18.040, do fall within the broader language of the exclusion for "[r]esidence at an institution, . . . where residence is merely incidental to detention or the provision of medical, religious, educational, recreational, or similar services . . ." RCW 59.18.040(1). This exclusion applies to any living arrangement where the tenant has a purpose for living there independent and apart from the basic requirements of shelter and amenities.

*Sunrise*, 55 Wn. App. at 288.

As Stoebuck points out, the distinction between a "lodger" or "licensee" and a "tenant" is subtle. The congregate-care cases are based on this subtlety. In those cases, although the taxpayers provided a structured environment to pro-

mote treatment, they did not provide actual medical care. But in the case of nursing home residents, the primary purpose of the relationship is to provide medical care. We conclude that the relationship between Taxpayers and their residents better fits the concept of license than that of landlord-tenant. Taxpayers are, accordingly, not entitled to the sale-of-real-estate B&O tax exemption.

In conclusion, we hold that the Taxpayers do not qualify for the sale-of-real-estate B&O tax exemption because they do not rent or lease rooms to their residents. We affirm the trial court.

SEINFELD and HOUGHTON, JJ., concur.

Reconsideration denied December 21, 2000.

Review denied at 144 Wn.2d 1008 (2001).